[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13154
_____

Agency No. 16-CA-152423

SECURITY WALLS, INC.,

Petitioner - Cross Respondent,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent - Cross Petitioner.

_____

Petitions for Review of a Decision of the
National Labor Relations Board
_____

(April 23, 2019)

Before TJOFLAT and WILLIAM PRYOR, Circuit Judges, and MURPHY,[*]
District Judge.

TJOFLAT, Circuit Judge:

_____

[*] Honorable Stephen J. Murphy, III, United States District Judge for the Eastern District
of Michigan, sitting by designation.

A private security contractor signed an agreement with the Internal Revenue Service (the "IRS") to provide protective services at one of its facilities. The agreement required the contractor to ensure that the guards it employed conformed to specifically enumerated standards of conduct. The contractor designed a discipline system to monitor guard compliance with those standards. But the IRS provided itself with another layer of protection: power to short-circuit that system and require the immediate removal of a non-conforming guard.

Three guards misbehaved. The contractor, without prompting from the IRS, suspended (and then terminated) them, a consequence much harsher than what the contractor's own discipline system called for. It turns out that by circumventing its own system, the contractor violated the National Labor Relations Act of 1935 (the "NLRA"), 29 U.S.C. §§ 151–69.

The contractor has an explanation for its wrongdoing: Its contract with the IRS *required* it to fire the guards. The question on appeal is whether the National Labor Relations Board (the "Board") abused its discretion by not reopening the administrative record to allow the contractor to establish that point. Because the contractor's proffer does not prove the point, we hold that the Board did not abuse its discretion in letting the record stand as it was.

I.

A.

Security Walls is a governmental security contractor.  On March 1, 2014, it entered into a contract with the IRS to provide guard services at the agency's facility in Austin, Texas (the "Facility").  The contractor that it replaced was a party to a collective-bargaining agreement with the International Union, Security, Police and Fire Professionals of America (the "Union"), for a unit of guards that worked at the Facility.  Declining to adopt that agreement, however, Security Walls commenced new collective-bargaining negotiations in August 2014.[1]  When it first began providing services under the contract, Security Walls posted at the Facility a document called the "Performance Work Statement" (the "PWS"), which was part of its contract with the IRS.

The PWS requires Security Walls to ensure that its employees conform to "acceptable standards of conduct."  It sets out thirty-five "actions, behaviors, or conditions" by employees that constitute "cause for immediate removal from performing on the contract."  Security Walls must "maintain[] satisfactory standards of employee . . . conduct" and "tak[e] such disciplinary action with respect to [its] employees as may be necessary."  At the same time, however, the

---

[1] The parties eventually negotiated an agreement that became effective on September 1, 2015, but that agreement is not in play here.

3

IRS "may request [Security Walls] to immediately remove any employee . . . should it be determined that the employee has been disqualified for either employment suitability, performance suitability, or security reasons, or who is found to be unfit for performing security duties during his/her tour of duty."[2] The IRS's power to demand an employee's removal is vested in the Contracting Officer (the "CO") and the Contracting Officer's Representative (the "COR"), who may require the "retraining . . ., suspension, or removal of any Contract employee from the contract who does not meet and adhere to the Standards of Conduct as required in th[e] contract."  Security Walls "must comply with these requests in a timely manner."

Before we recount the events that gave rise to this suit, we briefly introduce the key players in our discussion.  On the Security Walls side, Juanita Walls is the contractor's chief manager, Scott Carpenter manages this particular contract between the contractor and the IRS, and Frederico Salazar supervises the Facility. On the IRS side, John Sears is the COR, and Bernadette Briggs is a senior contracting specialist.

On April 25, 2014, Security Walls, through Juanita Walls and Carpenter, adopted a new policy, the "Disciplinary Action/Policy Statement" (the "Policy

---

[2] A "determination of unfitness may be made from . . . violations of the Standards of Conduct."

4

Statement"). The Policy Statement, on its face, purports to be the "official policy of 'Security Walls' and supersedes all other policies concerning this subject." It puts forth a progressive disciplinary system: Though some violations result in immediate termination,[3] others result in more graduated discipline.

Fast forward about one year after the Policy Statement was adopted. On April 15, 2015, guard John Klabunde was manning the Facility's visitor center when guard Jason Schneider arrived to relieve him for his scheduled break. During the transition, while the two men were both focused on correcting an error in the logbook, a woman walked into the Facility undetected. Security Walls indefinitely suspended both guards the following day. Guard Christopher Marinez faced a similar fate. On April 22—exactly one week after the prior incident— Marinez was adjusting his chair when a woman and her child also passed through (undetected) the area he was supposed to be monitoring. He was indefinitely suspended the same day.

The day after Marinez's suspension, on April 23, the Union filed a grievance over all three suspensions. Because Security Walls had failed to follow the

---

[3] These offenses are refusing to cooperate in an investigation; sleeping or engaging in sexual activity while on duty; falsifying, concealing, removing, mutilating, or destroying official documents or records; and willfully concealing material facts from official documents, records, or statements.

progressive disciplinary protocol outlined in its own Policy Statement, the Union demanded reinstatement of the guards.

On the same day, Carpenter, who was effectively the customer-service representative for Security Walls, exchanged a series of emails with Sears, who was effectively the client.[4]

Sears, who initiated the communication, stated that he would not accept "substandard services" from Security Walls. "If individual guards do not have the character and self-discipline to work at a federal installation and comply with the responsibilities associated," he went on, "they will need to be removed." He nonetheless expressed hope that Security Walls would "adopt an effective system of discipline for these types of violations and deter them from happening." Later that day, after having reviewed the video footage involving Marinez, he contacted Carpenter again. From the footage, he concluded that Marinez "turned his back momentarily to apparently adjust his chair," which in Sears's mind did not constitute "careless behavior." He analogized this mishap to the incident the prior week involving Klabunde and Schneider. Sears qualified this concession, however, by stating that guards "must be able to multi-task and recognize what's going on around them." He expressed hope that Security Walls "can address this

---

[4] Carpenter managed this particular contract on behalf of Security Walls, and Sears was the IRS's COR, who under the PWS had the ability to demand an employee's removal.

6

so that guards are paying greater attention to details so we don't miss these types of incidents."

Carpenter responded by saying that the guards "neglected their most primary duty," by expressing gratitude that an "angry, armed person [didn't] gain access," and by indicating that he looked forward to an-already scheduled meeting between him and Sears the following day.  Meanwhile, he would be conducting an internal investigation.

That's where Sears left it: fully aware of the incidents but deferring to Carpenter's judgment on how to proceed.

The following day, on April 24, Carpenter completed his investigation.  He determined that Schneider, Klabunde, and Marinez violated two of the thirty-five offenses under the PWS: "[v]iolation of security procedures" and "[n]eglecting duties."  In his view, the enumerated standards of conduct "are non-discretionary and necessarily supersede and take precedence over any other policy or standard not contained in the PWS, including Security Walls['s] internal disciplinary standards and policies."  Invoking Security Walls's obligation under the PWS to ensure that its employees conform to "acceptable standards of conduct," Carpenter recommended that the three guards be terminated.

On April 28, Salazar notified Schneider, Klabunde, and Marinez that they were terminated.  The following day, Security Walls, through counsel, clarified to

the Union that the guards were only suspended, not terminated.  They would "remain on suspension pending a final decision by [Juanita Walls] as to whether either of the officers has committed a violation of the Standards of Conduct set out in the PWS."  Counsel repeated Carpenter's assertion that the guards' actions "fall under the specifications of the PWS[] and are outside the conduct defined in Security Walls['s] [Policy Statement]."  The guards were eventually terminated, and on May 14, 2015, the Union filed a charge alleging unfair labor practices under the NLRA, an action that prompted the Board to issue a complaint.

## B.

The NLRA makes it unlawful for an employer to "refuse to bargain collectively with the representatives of his employees."  29 U.S.C. § 158(a)(5).[5] This refusal to bargain includes "unilaterally changing the terms and conditions of employment without first granting its employees' exclusive bargaining representative the opportunity to bargain about 'mandatory' subjects."  *NLRB v. Haberman Constr. Co.*, 641 F.2d 351, 357 (5th Cir. Apr. 1981) (en banc).[6]  An employer's disciplinary system is a mandatory subject, *Toledo Blade Co.*, 343

---

[5] Section 158(a)(1) makes it unlawful to "interfere with, restrain, or coerce employees" while they exercise various rights under the NLRA.  29 U.S.C. § 158(a)(1).

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

8

N.L.R.B. 385, 387 (2004), as are negotiations over termination of employment, *Ryder Distrib. Res., Inc.*, 302 N.L.R.B. 76, 90 (1991).

The administrative law judge (the "ALJ") found that Security Walls violated these provisions when (1) in violation of the Policy Statement's graduated disciplinary protocol, it suspended indefinitely and then discharged the guards and (2) it refused to bargain with the Union following those discharges. *Security Walls, Inc.*, 365 N.L.R.B. No. 99, slip op. at 3 (June 15, 2017). The ALJ reasoned that the PWS—on its face—put the guards' removal within Security Walls's and the IRS's discretion. *Id.* He also observed that Security Walls admitted in its Answer that it exercised discretion in terminating the guards. *Id.* Security Walls appealed the ALJ's decision to the Board.

After the ALJ issued his decision but while the matter was pending before the Board, on March 16, 2016, Security Walls moved the Board, under its regulations, to reopen the record for two purposes: (1) to introduce an affidavit and (2) to amend its Answer. The affidavit, sworn to by Juanita Walls (the "Walls affidavit"), stated that she had received an email from Briggs[7] on March 9, 2016, in which Briggs stated that Schneider, Klabunde, and Marinez "[would] not be permitted to perform services under th[e] contract, effective immediately." Walls further swore, "I believe that if Ms. Briggs or the COR were aware of the

_____

[7] Recall that Briggs was a senior contract specialist with the IRS.

9

circumstances surrounding the three officers in April 2015, they would have taken the same position as when they became aware of the incidents recently." In Security Walls's view, the Walls affidavit precluded any finding that the terminations were discretionary. Security Walls thus sought to amend its Answer to withdraw its admission to the contrary.

As to the violations, the Board affirmed the ALJ's findings. It held that neither the Policy Statement nor the PWS required Security Walls to remove the guards. *Id.* Under the PWS, the CO or the COR had the "authority to" require the guards' removal. *Id.* But Sears—as the COR—declined to exercise that authority, *id.*, and the record contained no evidence of any CO that was charged with enforcing the contract, *id.* at n.6. Contrary to Walls's speculation that if the COR were aware of the circumstances he would have required removal, the Board reasoned that Sears *was* aware of the circumstances and neither required the guards' removal nor told Carpenter that Security Walls's contract was in "jeopardy." *Id.* at 3. He was aware that he could take action, moreover, because he had required an employee's removal at least once in the past. *Id.*

As to reopening the record, the Board concluded that Security Walls had not made the requisite showing under the regulations. A party may move to reopen the record due to "extraordinary circumstances." 29 C.F.R. § 102.48(d)(1) (amended 2017). The evidence either must "ha[ve] become available only since the close of

the hearing" or, in the Board's view, "should have been taken at the hearing." *Id.* The movant must state "the additional evidence sought to be adduced, why it was not presented previously, and that, if adduced and credited, it would require a different result." *Id.*

The Board denied the motion because neither admitting the Walls affidavit nor allowing the pleading amendment would have demanded a "different result." *Security Walls, Inc.*, slip op. at 6. It reasoned that (1) "neither the PWS nor the [Policy Statement] mandated these discharges. As such, [Security Walls's] admission is consistent with, but not an indispensable part of, the evidence underlying this finding," *id.* at 7 n.18, and (2) neither Sears nor any other IRS representative demanded the guards' removal at the time, and the Walls affidavit, sworn to "some 10 months after the discharges and after the [ALJ] had found that [Security Walls] acted unlawfully" would not change that fact, *id.* at 7.[8]

The Board required Security Walls to rescind the unilateral change to its Policy Statement; to offer Schneider, Klabunde, and Marinez reinstatement; to make them whole for any losses to earnings or other benefits; to remove any reference to the discharges from their personnel files; and to post a remedial notice at the Facility. *Id.* at 7−8.

---

[8] It also reasoned that the Walls affidavit came into existence "after the [alleged events] in this case" and thus, "by definition, is not 'newly discovered' or 'previously unavailable,'" which the Board's precedents required. *Id.*

11

Security Walls then petitioned this Court for review under 29 U.S.C. § 160(f), which grants us jurisdiction over final orders of the Board.

## II.

The question in this case is not whether the guards' terminations were proper under the Policy Statement; everyone, including Security Walls, agrees that none of the guards' conduct could have resulted in their indefinite suspension and eventual termination under the Policy Statement.[9]  Security Walls's argument on appeal is straightforward: the PWS—and this is Security Walls's phrasing, not ours—"supersedes" the Policy Statement, and Security Walls is absolved of liability to the extent the PWS compels an outcome that would otherwise place Security Walls in violation of its collective-bargaining obligations under the NLRA.  From there, Security Walls tells us, it's easy to see why the record should be reopened.  The Walls affidavit confirms its position that the PWS left it with "no choice" but to terminate the guards, and Security Walls should be permitted to amend its Answer to withdraw its admission to the contrary—that the terminations were in fact discretionary.

---

[9] The guards' conduct constituted "violation of written rules, regulations or policy."  For first-time offenders, the Policy Statement prescribes verbal counseling and a memorandum to be included in the personnel file; second-time offenders get a letter of reprimand; third-time offenders get a two-day suspension; and fourth-time offenders are terminated.  If a violation results in a security breach, however, the protocol accelerates the discipline for first offenses to suspension and for second offenses to termination.  None of the three guards had previously been disciplined, so the Policy Statement called for, at most, two-day suspensions.

12

As an initial matter, we are skeptical of Security Walls's premise that it holds a get-out-of-jail-free card when it cannot simultaneously comport with both the PWS and the NLRA.[10]  As the Board reasoned, the PWS is a "non-personal services contract between [Security Walls] and the IRS" and thus "reflects the agreement between [Security Walls] and the IRS, but not necessarily between [Security Walls] and its own employees."  *Security Walls, Inc.*, slip op. at 4 n.8. Security Walls subjected itself to two masters—its contractual obligations to the IRS on the one hand and its duties under the NLRA to its employees on the other. As such, it might have voluntarily put itself between a rock and a hard place from which there is no painless resolution.  We assume for purposes of discussion, however, that Security Walls's contention is correct and thus that the PWS "supersedes" the Policy Statement.  We do so because nothing about the PWS required the guards' removal; Security Walls was able to comply with both the PWS and the Policy Statement.

We review the Board's "procedural determinations," like denial of a motion to reopen the record, for abuse of discretion.  *See U.S. Mosaic Tile Co. v. NLRB*,

---

[10] The doctrinal hook for this argument is unclear, if for no other reason than because Security Walls has provided us no law on point.  The argument sounds in something akin to conflict preemption, a doctrine corollary to the Supremacy Clause, *see* U.S. Const. art. VI, cl. 2, which results where "'compliance with both state and federal law is impossible,' or where 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Oneok, Inc. v. Learjet, Inc.*, ___ U.S. ___, 135 S. Ct. 1591, 1595 (2015) (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100, 101, 109 S. Ct. 1661, 1665 (1989)).

13

935 F.2d 1249, 1254 (11th Cir. 1991); *see also* 5 U.S.C. § 706(2)(A).  In doing so, we look through the decision to the logical pillars on which it rests.  In *U.S. Mosaic Tile Co.*, for example, we reviewed the Board's denial of a motion for reconsideration, but that decision rested on interpretation of a statute and application of the agency's own caselaw.  935 F.2d at 1254.  We afforded *Chevron* deference[11] to the statutory interpretation and subjected the caselaw application to arbitrary-and-capricious review.  935 F.2d at 1254.  We then determined, in light of our conclusions on those issues, whether the Board abused its discretion in denying the motion.  *Id.* at 1254–55.

What are the bases of the Board's decision here?  The Board denied Security Walls's motion because neither the Walls affidavit nor a pleading amendment would have demanded a "different result."  *Security Walls, Inc.*, slip op. at 6.  Again, it reasoned that (1) the PWS did not mandate the terminations and (2) neither Sears nor any other IRS representative demanded the guards' removal when they were terminated.  *Id.* at 7, 7 n.18.

The Board's first reason flows from its interpretation of the PWS.  The deference we afford to an agency's interpretation of a contract, like the PWS, varies on a case-by-case basis.  *See Muratore v. U.S. Office of Pers. Mgmt.*, 222

---

[11] *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778 (1984).

F.3d 918, 921–23 (11th Cir. 2000) (reasoning that whether an agency's interpretation of a contract is subject to *de novo* or arbitrary-and-capricious review turns on, among other things, the agency's "relevant expertise" in negotiating the contract at issue).  We do not determine which standard applies here because our interpretation of the PWS and the Board's are identical: The PWS is purely permissive.  The IRS "may request" removal of an employee, but nothing requires it to do so.  That's it.  From there, holding that the Board did not abuse its discretion is a cakewalk.

Security Walls wants to amend its Answer for no reason other than to argue that the terminations were required.  But the Board—looking to the text of the PWS rather than Security Walls's self-serving statement—concluded otherwise. Indeed, the Board twice stated that the Answer was "consistent with" its conclusion but made perfectly clear that it was "not an indispensable part of[] the evidence underlying this finding."  *Security Walls, Inc.*, slip op. at 7 n.18.  The Walls affidavit serves the same purpose.  Security Walls does not dispute the Board's finding that no one at the IRS ordered the guards' removal.  So its argument that the IRS *would have* required as much is beside the point.  The Walls affidavit is thus irrelevant.

In short, we find it "entirely reasonable" for the Board to deny Security Walls's motion to reopen the record when the record supports its conclusion that

15

doing so would not compel a "different result." *See U.S. Mosaic Tile Co.*, 935 F.2d at 1257.

III.

For these reasons, Security Walls's petition for review is **DENIED.**

**SO ORDERED.**