STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

19-844


UNITED STATES AIRCRAFT INSURANCE GROUP

VERSUS

GLOBAL TOWER, LLC D/B/A
GLOBAL TOWER PARTNERS, ET AL


\*\*\*\*\*\*\*\*\*\*\*
APPEAL FROM
THIRTY-FIRST JUDICIAL DISTRICT COURT,
PARISH OF JEFFERSON DAVIS, NO. 93-14
HONORABLE C. STEVE GUNNELL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*
SYLVIA R. COOKS
JUDGE
\*\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Phyllis M. Keaty and Van H. Kyzar, Judges.

AFFIRMED.

Isaac H. Ryan
Deutsch Kerrigan L.L.P.
755 Magazine Street
New Orleans, LA  70130
(504) 593-0792
Attorney for Appellants:
 GTP Infrastructure I, LLC and
  CNA Insurance Company
Kendall J. Krielow
Block Law Firm, APLC
P.O. Box 108
Thibodaux, LA  70302
(985) 446-0418
Attorney for Appellees:
 Riceland Aviation, Inc. and
 United States Aircraft Insurance Group

**COOKS, Judge.**

## FACTS AND PROCEDURAL HISTORY

GTP Infrastructure I, LLC (GTP) is the owner of a certain communication transmission tower located near Jennings, in Jefferson Davis Parish, Louisiana. GTP's tower is insured by CNA Insurance Company (CNA). The tower is located in an agricultural setting surrounded by open fields used for planting various crops. On February 15, 2013, an experienced local crop duster pilot, William Precht, Jr., was killed when his airplane, owned by Riceland Aviation, Inc. (Riceland) and insured by United States Aircraft Insurance Group (USAIG), struck an unmarked guy wire securing GTP's tower. Precht's plane was a total loss. The crash also caused damage to GTP's tower. At the time of the crash, GTP's tower was secured by eight, half-inch guy wires, some of which extended nearly 300 feet out from the base of the tower into the adjacent agricultural field where Precht was aeronautically applying herbicide to prepare the field for planting. The guy wires on GTP's tower were not marked by TANA aviation marker balls as required by Jefferson Davis Parish Ordinance 5.5-107(e) which provides that: "Any guy wires used for support of any tower shall include TANA wire markers that enable aircraft pilots to identify the location of such guy wires."

GTP and its insurers sued Riceland and USAIG for property damage to its tower identified as tower LA-5136 (tower). Riceland and USAIG answered the suit and reconvened in docket number 83-14, Thirty-first Judicial District Court, Parish of Jefferson Davis, Louisiana. USAIG sought subrogation for its payment to Riceland for the total loss of the plane in a separate suit filed against GTP, its parent companies, and its insurers, in docket number 93-14, Thirty-first Judicial District Court, Parish of Jefferson Davis, Louisiana. GTP sought to dismiss USAIG's subrogation claim against it through a motion for summary judgment. The basis of

GTP's motion was the assertion that the local ordinance requiring TANA markers was not enforceable because the ordinance is preempted by federal law. It also asserted the tower was free of any defects that could have caused the crash and it further alleged Riceland and USAIG could not show that GTP knew or should have known about Jefferson Davis Parish Ordinance 5.5-107. The trial court denied the motion. GTP did not seek appellate review of the denial of its motion for summary judgment.

The two suits were consolidated for trial purposes. On June 27, 2019, a jury returned a verdict finding Precht 21% at fault and GTP 79% at fault for the plane crash. The jury awarded Riceland and USAIG $645,139.58 in damages for the airplane which was determined to be a total loss. The trial court entered judgment in favor of USAIG and against "GTP Infrastructure I, LLC, Global Tower, LLC, GTP Investments, LLC and CNA Insurance Company" in the sum of $509,660.26. GTP and CNA Insurance Company appeal the judgment alleging four assignments of error:

> The district court erred in denying GTP's Motion for Summary Judgment because the tower was free of defects and plaintiff did not adduce evidence GTP knew or should have known about Jefferson Davis Ordinance 5.5-107.

> The district court erred in instructing the jury regarding Jefferson Davis Parish Ordinance 5.5-107, because that Ordinance is preempted by the Federal Aviation Act.

> The jury erred in allocating only 21% fault to Mr. Precht.

> The jury awarded damages not allowed by law.

**ANALYSIS**

Although GTP and its insurer did not seek appellate review of the trial court's judgment immediately after the denial of their motion they now raise the issue on appeal after a full trial on the merits. USAIG asserts we cannot address this

2

assignment of error because the denial of the motion for summary judgment was an interlocutory ruling from which no appeal lies. It asserts GTP's exclusive remedy was by supervisory writ, which it did not pursue. We reject this argument. "Generally, pursuant to La.Code Civ.P. art. 968, the denial of a motion for summary judgment is an interlocutory judgment from which an appeal may not be taken. However, when there is also an appeal from a final judgment[,] . . . an appellate court may also review the interlocutory ruling." *Landry v. Pediatric Servs. of Am., Inc.*, 15-899 p. 4, (La.App. 3 Cir. 4/6/16), 189 So.3d 540, 543–44, (citations omitted), *writ denied*, 16-785, 16-845 (La. 6/17/16), 192 So.3d 771, 773. Thus, we may review the trial court's denial of GTP's motion for summary judgment in this appeal. But, under such circumstances, the applicable standard of review is *not de novo* as GTP suggests. As we explained in *Lemoine v. Augustine*, 16-862 pp. 5-6, (La.App. 3 Cir. 2/14/17) 2017 (unpublished opinion), *writ denied*, 17-0534 (La. 5/19/17), 221 So.3d 77, the proper standard of review here is the manifest error-clearly wrong standard of review:

> [D]efendants did not apply for supervisory writs concerning the denial of their motion. Rather, they challenge, as manifest error, the trial court's casting them in judgment when all claims against Mary were prescribed. It is now well established that an appellate court should not restrict its fact review to affidavits and pleadings in support of the motion for summary judgment where the denial of the motion for summary judgment is appealed after the matter has been fully tried. *Hopkins v. Am. Cyanamid Co.*, 95–1088 (La. 1/16/96), 666 So.2d 615. In so ruling, the supreme court explained:
>
> > [O]nce a case is fully tried, the affidavits and other limited evidence presented with a motion for summary judgment—later denied by the district court—are of little or no value. Appellate courts should not rule on appeal after a full merits trial on the strength alone of affidavits in support of a motion for summary judgment that was not sustained in the district court. In such cases, appellate courts should review the entire record.
>
> *Id.* at 624.

3

Accordingly, the traditional manifest error-clearly wrong standard of review of the entire trial record applies to our review of the trial court's factual findings on the issue of prescription. *Marin v. Exxon Mobil Corp.*, 09–2368, 09–2371 (La. 10/19/10), 48 So.3d 234. Nevertheless, we review the trial court's legal conclusion "simply to determine whether or not the trial court was legally correct[.]" *Dauzart v. Fin. Indem. Ins. Co.*, 10–28, p. 3 (La.App. 3 Cir. 6/2/10), 39 So.3d 802, 805.

In *Janise v. Acadian Ambulance Service, Inc.*, 17-1100, pp. 6-7, (La.App. 3 Cir. 4/25/18), 244 So.3d 541, 546, this court explained the role of appellate review of a jury's findings of fact:

> Regarding appellate review of factual findings, the supreme court has explained:
>
> > In reviewing the factual findings of a trial court, we are limited to a determination of manifest error. *Hill v. Morehouse Parish Police Jury*, 95-1100, p. 4 (La. 1/16/96), 666 So.2d 612, 615. It is well settled that an appellate court may not disturb a jury's finding of fact unless the record establishes that a factual, reasonable basis does not exist and the finding is clearly wrong or manifestly erroneous. *Syrie v. Schilhab*, 96-1027, p. 4 (La. 5/20/97), 693 So.2d 1173, 1176. An appellate court must do more than simply review the record for some evidence which supports or controverts the findings. *Stobart v. State of La., through Dep't of Transp. & Dev.*, 617 So.2d 880, 882 (La.1993). It must instead review the record in its entirety to determine whether the factual findings were clearly wrong or manifestly erroneous. *Id.*
> >
> > Significantly, the issue to be resolved is not whether the jury was right or wrong, but whether its conclusion was reasonable. *Id.* Thus, this Court, after a full review of the record, may not reverse reasonable findings, even if we had weighed the evidence differently sitting as the trier of fact. *Siverd v. Permanent General Ins. Co.*, 05-0973, p. 3 (La. 2/22/06), 922 So.2d 497, 500.
>
> *Fontenot v. Patterson Ins.*, 09-669, pp. 8-9 (La. 10/20/09), 23 So.3d 259, 267.

We have reviewed the entire record and conclude the trial court did not manifestly nor legally err in denying GTP's motion for summary judgment and it did not err in finding GTP liable for damages. Because we review the denial of the

4

motion for summary judgment in this case based on the entire record there is substantial overlap in the treatment of that issue and GTP's additional issues presented for review.

We find Jefferson Davis Parish Ordinance 5.5-107 is not preempted by federal aviation law. Thus, GTP was not entitled to summary judgment as a matter of law on that basis as they maintain. "The critical question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law." *La. Pub. Serv. Comm. v. F.C.C.*, 476 U.S. 355, 369, 106 S. Ct. 1890, 1899 (1986). Additionally, there is a presumption against pre-emption.

> The doctrine of preemption is a necessary but precarious component of our system of federalism under which the states and the federal government possess concurrent sovereignty, subject to the limitation that federal law is "the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Consistent with this principle, Congress has the power to enact legislation that preempts state law. *See Arizona v. United States,* —— U.S. ——, 132 S.Ct. 2492, 2500–01, 183 L.Ed.2d 351 (2012). At the same time, with due respect to our constitutional scheme built upon a "compound republic," with power allocated between "two distinct governments," The Federalist No. 51, at 323 (James Madison) (Clinton Rossiter ed., 1961); *see also U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 838, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (Kennedy, J., concurring), there is a strong presumption against preemption in areas of the law that States have traditionally occupied, *see Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996); *Bruesewitz v. Wyeth, Inc.,* 561 F.3d 233, 240 (3d Cir.2009) (explaining that, "[w]hen faced with two equally plausible readings of statutory text, [courts] have a duty to accept the reading that disfavors preemption" (internal quotation marks omitted)). For that reason, all preemption cases "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine,* 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (quoting *Medtronic,* 518 U.S. at 485, 116 S.Ct. 2240) (internal quotation marks omitted). Congressional intent is the "ultimate touchstone" of a preemption analysis. *Id.* Thus, when confronted with the question of whether state claims are preempted, as we are here, we look to the language, structure, and purpose of the relevant statutory and regulatory scheme to develop a "reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Medtronic,* 518 U.S. at 486, 116

S.Ct. 2240; *see also Bruesewitz,* 561 F.3d at 243–44 (recognizing that divining congressional intent regarding preemption requires considering a law's "structure and purpose," underlying "object and policy," and, where relevant, legislative history (internal quotation marks omitted)).

Congress may exert its supremacy by expressly preempting state law, but it may also do so implicitly, which we have recognized in limited circumstances in the doctrine of "field" preemption. *See Oneok, Inc. v. Learjet, Inc.,* ⸺ U.S. ⸺, 135 S.Ct. 1591, 1595, 191 L.Ed.2d 511 (2015). For that doctrine to apply, "we must find that federal law leaves no room for state regulation and that Congress had a clear and manifest intent to supersede state law" in that field. *Elassaad v. Indep. Air, Inc.,* 613 F.3d 119, 127 (3d Cir.2010) (quoting *Holk v. Snapple Beverage Corp.,* 575 F.3d 329, 336 (3d Cir.2009)) (alteration and internal quotation marks omitted). Where Congress expresses an intent to occupy an entire field, States are foreclosed from adopting any regulation in that area, regardless of whether that action is consistent with federal standards. *Oneok,* 135 S.Ct. at 1595.

In addition to field preemption, federal law may supersede state law through conflict preemption. This occurs when a state law conflicts with federal law such that compliance with both state and federal regulations is impossible, *PLIVA, Inc. v. Mensing,* 564 U.S. 604, 131 S.Ct. 2567, 2577, 180 L.Ed.2d 580 (2011), or when a challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law," *Williamson v. Mazda Motor of Am., Inc.,* 562 U.S. 323, 330, 131 S.Ct. 1131, 179 L.Ed.2d 75 (2011) (internal quotation marks omitted).

*Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 687–88 (3 Cir. 2016), *cert. denied*, 137 S.Ct. 495 (U.S. 11/28/16).

GTP asserts that the "Federal Aviation Act of 1958, Pub. L. no. 85-726, 72 Stat. 731, as amended, assigns to the Administrator of the Federal Aviation Administration (FAA) comprehensive responsibility for ensuring the safety of air travel," citing 49 U.S.C. 44701 as authority for its proposition that the field of aviation is federally preempted. GTP interprets this, along with the language of 49 U.S.C. 40103(b)(1), as indicative of "Congress' intent to delegate the responsibility of regulating all obstructions to the Federal Aviation Administration ("FAA") to ensure national uniformity in the regulation of navigable air space." The courts,

6

however, have not so interpreted nor applied these statutes to prohibit state and local laws concerning aviation.

> *There is no express preemption of air transportation in the FAA*[Federal Aviation Act]. In 1978, Congress enacted the ADA [1978 Airline Deregulation Act] to dismantle federal economic regulation and to prevent the states from frustrating the goals of deregulation by establishing or maintaining economic regulations of their own. The ADA preempts the states from enforcing any law "*relating to rates, routes or services*" of any carrier.

> On appeal, Perdigao argues his claims are not preempted, citing two U.S. Supreme Court cases. Delta and Baird urge that the cases relied on by Perdigao address only the preemptive scope of the 1978 ADA, and that, in the present case, the trial court relied on the "implicit" or "field" preemption of the 1958 FAA[Federal aviation Act]. Delta cites several cases in support of its position that "federal law governs the standards for aviation safety," which cases were apparently relied on, at least in part, by the trial court. On review, we find Delta's conclusion that the federal government has implicitly preempted every aspect of the field of aviation *is not supported by the jurisprudence.*

*Perdigao v. Delta Airlines, Inc.*, 05-325, pp. 4-5, (La.App. 5 Cir. 11/13/07), 973 So.2d 33, 36 (footnotes omitted) (emphasis added).

Likewise, this court in *Stream Aviation, Inc. v. Anders Production, Inc.*, 517 So.2d 1157, 1159-61 (La.App. 3 Cir. 1987) (emphasis added), *writ denied*, 521 So.2d 1171 (La. 1988), held that Congress has expressed no intent to completely pre-empt state law in the field of air transportation:

> The Court, in declining to enforce Stream's alleged contract, stated that when Congress enacted the Federal Aviation Act, 49 U.S.C. § 1301 et seq., Congress expressly preempted the field of air transportation. The Court cited as authority, 49 U.S.C. § 1305(a)(1) (1958) (amended 1984) which provides, in part:

>> No state ... shall enact or enforce any law, rule, regulation, standard or other provision having the force and effect of law relating to *rates, routes, or services* of any air carrier having [Civil Aeronautics Board] authority ... to provide air transportation.

> The Court concluded that FAA regulations have the effect of laws of the United States and that to provide Stream with the relief it sought

would be contrary to the Supremacy Clause of the United States Constitution. U.S.Const. Art. VI, cl. 2.

. . . .

Our decision in this case rests entirely on the conclusion that the lower court incorrectly interpreted Section 1305 addressing federal preemption of the field of civil aviation. Having concluded that Anders is not entitled to judgment as a matter of law, we need not address the question of whether there was a genuine issue of material fact. We will not, in other words, decide whether Stream's aircraft should have had a Part 135 ATCO operating certificate or whether Stream was properly flying its craft in accordance with Part 91.

The Trial Court concluded that when Congress preempted the field of civil aviation it intended that state judiciaries be prohibited from enforcing valid contracts. Without considering whether Stream and Anders had a contract, we do not believe that Congress intended to prevent the judicial enforcement of legal contracts when an air carrier is operating a craft in violation of federal regulations. We believe that if Congress had intended to impose such a penalty it would have done so in a more explicit manner.

Section 1305, 49 U.S.C. § 1305, *supra,* as previously stated, provides:

> [N]o State ... shall enact or enforce any law, rule, regulation, standard or other provision having the force and effect of law relating to *rates, routes, or services* of an air carrier having [Civil Aeronautics Board] authority ... to provide air transportation.

We believe it was the intention of Congress in enacting Section 1305 to prevent local interference with a matter it deemed to be of national significance, air commerce. *We believe that Congress' intent was to prevent the enactment and/or enforcement of laws, ordinances or other acts which would directly or indirectly inhibit the promotion of efficient, nationally regulated air transportation. See, City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973) (invalidating a local ordinance prohibiting jet take-offs between 11 p.m. and 7 a.m.); *United States v. City of New Haven,* 447 F.2d 972 (2nd Cir.1971) (affirming a preliminary injunction granted by a federal district court restraining a city from complying with a state court order ordering it to obtain approval from a neighboring city to use property purchased in that municipality as a "clear zone" for an airport runway and forcing partial closure of a runway); *County of Cook v. Priester,* 22 Ill.App.3d 964, 318 N.E.2d 327, (1st Dist.1974), *aff'd,* 62 Ill.2d 357, 342 N.E.2d 41 (1974) (declaring local restrictions on aircraft weight to be, inter alia, in contravention of federal law); and *City of Bensenville v. City of Chicago,* 16 Ill.App.3d 733, 306 N.E.2d 562 (1st Dist.1973) (declaring

that Congress has preempted state and local aircraft noise and air pollution regulations). The judicial enforcement of a contract for air transportation, subsequent to the faithful completion by the carrier, even when the carrier is not appropriately certified is not the enactment or enforcement of a law or regulation relating to "rates, routes, or services of an air carrier." 49 U.S.C. § 1305, *supra.*

In the same manner, a local ordinance requiring the placement of TANA markers on the guy wires of transmission towers so as to enable crop duster pilots to locate the wires quickly from a greater distance has nothing to do with rates, route or services of air transportation. The local ordinance is not contrary to or inconsistent with any federal safety requirements for marking transmission towers, such as the type of lighting required by federal mandates. It does not impede minimum federal safety regulations but adds additional protection. It is true, as GTP asserts, that federal law recognizes the "United States Government has exclusive sovereignty of airspace," 49 U.S.C. § 40103(a), but that does not equate to either the express or implied intent of Congress to preempt the right of local authorities to impose greater safety requirements on transmission towers which are an obstacle to all aviation, particularly when considering the added danger posed by unmarked guy wires to low flying crop dusters.

> The Supremacy Clause, among other things, confirms that when Congress legislates within the scope of its constitutionally granted powers, that legislation may displace state law, and this Court has throughout the years employed various verbal formulations in identifying numerous varieties of pre-emption. See, *e.g., Louisiana Public Service Comm'n v. FCC,* 476 U.S. 355, 368–369, 106 S.Ct. 1890, ——, 90 L.Ed.2d 369 (1986). But we have consistently emphasized that the first and fundamental inquiry in any pre-emption analysis is whether Congress intended to displace state law, and where a congressional statute does not expressly declare that state law is to be preempted, *and where there is no actual conflict between what federal law and state law prescribe*, we have required that there be evidence of a congressional intent to pre-empt the specific field covered by the state law. *Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Comm'n,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983); *Silkwood v. Kerr-McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443[1984].

*Wardair Canada, Inc. v. Fla. Dep't. of Revenue*, 477 U.S. 1, 6, 106 S. Ct. 2369, 2372 (1986) (emphasis added).

In *Sikkelee*, 822 F.3d at 692 (emphasis added), the federal appellate court found that the Federal Aviation Act, as amended, contains no express provision concerning preemption of state laws:

> As we have explained, although the federal government has overseen certain aspects of aviation, such as air traffic control and pilot certification, since the early days of flight, *see* Air Commerce Act of 1926, ch. 344, 44 Stat. 568, there was little question when the Civil Aeronautics Act was adopted in 1938 that common law standards governed tort claims arising from plane crashes, *see, e.g., Curtiss–Wright Flying Serv.,* 66 F.2d at 711–13 (applying the common law standard for negligence). **It is therefore significant that the Federal Aviation Act, which succeeded the Civil Aeronautics Act and remains the foundation of federal aviation law today, contains no express preemption provision.** *In fact, it says only that the FAA may establish "minimum standards" for aviation safety, 49 U.S.C. § 44701—statutory language the Supreme Court has held in other contexts to be insufficient on its own to support a finding of clear and manifest congressional intent of preemption, see Fla. Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 145, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); *see also Ray v. Atl. Richfield Co.,* 435 U.S. 151, 168 n. 19, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978); *Abdullah,* 181 F.3d at 373–74; *Cleveland,* 985 F.2d at 1445.

Louisiana has enacted an entire body of legislation exercising the state's authority in the field of aviation. Were we to accept GTP's argument, the entire body of such legislation could not be enforced. For example, La.R.S. 2:6 provides:

A. The department [Department of Transportation and Development (DOTD)] shall foster air commerce within the state of Louisiana and the department shall have supervision over the aeronautical activities and facilities, which authority shall include supervision and control over all airports, landing fields, landing strips, air instruction, air marking, air beacons, and all other air-navigation facilities.

B. (1) Accordingly, the department may prescribe such reasonable rules and regulations as it deems necessary and advisable:

(a) For the public safety and for the promotion of aeronautics governing the designing, laying out, location, building, equipping, operation, and use of all airports, landing fields, or landing strips;

(b) Governing the curriculum, equipment, personnel, and operation and management of all air instruction;

(c) For the purpose of protecting the health and safety of students receiving or to receive such instruction of student aviators;

(d) For the public safety and safety of those engaged in aeronautics;

(e) For the promotion of aeronautics governing the establishment, location, maintenance, and operation of all air markings, air beacons, and other air-navigation facilities.

(2) No rule or regulation prescribed by the department under the authority of this Section shall be inconsistent with the then-current federal legislation governing aeronautics and the regulations duly promulgated thereunder.

We note that just as this state legislation recognizes the superiority of federal legislation in this arena, so, too, does Jefferson Davis Parish Ordinance 5.5-107(c), which provides: "Federal restrictions shall supersede these requirements as may be required by law." The local ordinance addresses "lighting" of towers and speaks to situations in which there are federal and/or state lighting requirements and where there are no such requirements. The ordinance also adds to all lighting requirements the additional requirement of TANA marker balls placed on guy wires securing towers. We conclude the ordinance is not inconsistent with nor does it conflict with state and/or federal requirements but only enhances such safety measures.

Louisiana Revised Statutes 2:7 directs the Louisiana Department of Transportation and Development (DOTD) to "assist in the development of aviation and aviation facilities for the purpose of safeguarding the interests of those engaged in all phases of the industry and of the general public and of promoting aeronautics." It further directs DOTD to coordinate its efforts with federal, other state departments, and local political subdivisions, such as the Jefferson Davis Parish Police Jury:

Accordingly, the department may expend any or all the moneys allocated and deposited for the acquisition or enlargement by purchase, grant, lease, condemnation, or other means, and for the construction,

11

operation, and maintenance of airports, landing fields, or emergency landing strips, or of other aeronautic facilities or services for the safety and advancement of aeronautics, which shall include the joint establishment or provision of such aeronautic facilities or services *in cooperation with other state or federal departments or with other political subdivisions.*

La.R.S. 2:7(emphasis added).

Further, under La.R.S. 2:8, Louisiana law regulates the opening and operating of "[a]ll proposed airports, landing fields, air schools, flying clubs, air beacons, or other navigation facilities," and all such facilities must "first be approved by the department before they are so used or operated." Federal and state-owned facilities are not subject to the department's authority. *Id.* And in La.R.S. 2:9, DOTD is authorized to conduct "investigations, inquiries, and hearings concerning matters covered by the provisions of this Chapter, and all accidents in aeronautics, except for aircraft registration, identification, equipment, and enforcement delegated to the Department of Public Safety and Corrections."

In *Walker Louisiana Properties v. Broussard*, 01-711 p.6 (La.App. 3 Cir. 3/6/02), 813 So.2d 487, 491, *writ denied*, 02-1497, 02-1523 (La. 9/20/02), 825 So.2d 1175, 1180, *cert. denied*, 538 U.S. 944 (U.S. 3/31/03), while we recognized Congress' authority over navigable airspace, we also enforced a landowner's rights under La.Civ.Code art. 490 concerning the airspace above his property:

The Louisiana Civil Code Article 490 provides the ownership of a tract of land carries with it the ownership of *everything that is directly above* or under it. Furthermore, the airspace may be freely used by the public for aerial traffic at reasonable altitudes. Accordingly, Congress has recognized the need for modification of the notion of private ownership of air space and declared that the airspace above the minimum altitude for safe flight is navigable airspace subject to the public right for free transit. *See* Federal Aviation Program, 49 U.S.C.A. § 1301 *et seq.* The F.A.A. has fixed the minimum safe altitude at "1000 feet above the highest obstacle" over "congested areas," and, otherwise, at "500 feet above the surface, except over open water or sparsely populated areas." 14 C.F.R. § 91.79(b), (c). Louisiana Civil Law Treatise on Property, Vol. 2, Ch. 3 § 47.

Although the airspace above the appellee's property is navigable and subject to regulation, and although helicopters are excepted from some of those regulations, Federal Aviation Act regulations are not at issue in the instant matter. In the instant case, the subject property is located in a rural area of Calcasieu Parish, and is reachable only by private road owned and maintained by the appellee, Steven Broussard, otherwise, one can reach the property by air or water. The issue we must address is whether the appellant operating his helicopter at abusively low levels, interferes with the appellee's use and enjoyment of his land. We find it does. Accordingly, pursuant to Article 490 of the Louisiana Civil Code the appellee has a right to enjoy his property and, therefore, is entitled to injunctive relief.

In 49 U.S.C. § 40103, Congress makes no mention of any intent to preempt state or local authority but directs that in order to further the public's right to transit through navigable airspace "[t]he administrator of the Federal Aviation Administration shall develop plans and policy for the use of the navigable airspace and assign by regulation or order the use of the airspace *necessary to ensure the safety of aircraft and the efficient use of airspace*." 49 U.S.C. § 40103(b)(1) (emphasis added). It further provides in 49 U.S.C. §40103(2) and (3):

(2) The Administrator shall prescribe air traffic regulations on the flight of aircraft (including regulations on safe altitudes) for—

(A) navigating, protecting, and identifying aircraft;

(B) protecting individuals and property on the ground;

(C) using the navigable airspace efficiently; and

(D) preventing collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects.

(3) To establish security provisions that will encourage and allow maximum use of the navigable airspace by civil aircraft consistent with national security, the Administrator, in consultation with the Secretary of Defense, shall—

(A) establish areas in the airspace the Administrator decides are necessary in the interest of national defense; and

(B) by regulation or order, restrict or prohibit flight of civil aircraft that the Administrator cannot identify, locate, and control with available facilities in those areas.

13

In 49 U.S.C. § 44701, the Administrator of the FAA is directed to prescribe "minimum" safety standards to "promote safe flight of civil aircraft in air commerce."[1] In our view, directing the FAA to provide minimum safety standards

---

[1]    **49 U.S.C. § 44701** provides:

(a) Promoting safety**.**--The Administrator of the Federal Aviation Administration shall promote safe flight of civil aircraft in air commerce by prescribing—

(1) minimum standards required in the interest of safety for appliances and for the design, material, construction, quality of work, and performance of aircraft, aircraft engines, and propellers;

(2) regulations and minimum standards in the interest of safety for—

(A) inspecting, servicing, and overhauling aircraft, aircraft engines, propellers, and appliances;

(B) equipment and facilities for, and the timing and manner of, the inspecting, servicing, and overhauling; and

(C) a qualified private person, instead of an officer or employee of the Administration, to examine and report on the inspecting, servicing, and overhauling;

(3) regulations required in the interest of safety for the reserve supply of aircraft, aircraft engines, propellers, appliances, and aircraft fuel and oil, including the reserve supply of fuel and oil carried in flight;

(4) regulations in the interest of safety for the maximum hours or periods of service of airmen and other employees of air carriers; and

(5) regulations and minimum standards for other practices, methods, and procedure the Administrator finds necessary for safety in air commerce and national security.

(b) Prescribing minimum safety standards.--The Administrator may prescribe minimum safety standards for—

(1) an air carrier to whom a certificate is issued under section 44705 of this title; and

(2) operating an airport serving any passenger operation of air carrier aircraft designed for at least 31 passenger seats.

(c) Reducing and eliminating accidents**.**--The Administrator shall carry out this chapter in a way that best tends to reduce or eliminate the possibility or recurrence of accidents in air transportation. However, the Administrator is not required to give preference either to air transportation or to other air commerce in carrying out this chapter.

(d) Considerations and classification of regulations and standards**.**--When prescribing a regulation or standard under subsection (a) or (b) of this section or any of sections 44702-44716 of this title, the Administrator shall—

14

implies not that Congress has totally preempted the field, but instead, that additional

safety measures may be imposed by state and local authorities as Louisiana and

Jefferson Davis Parish Police Jury have done.  The local ordinance is in keeping with

the federal directive to provide the "highest possible degree of safety in the public

interest."  49 U.S.C. §44701(d)(1)(A).  It is also consistent with Louisiana state

aviation law.  Further, there is no indication in the state laws of any intent to pre-

empt local authority.

> Similar analyses are employed, in both the state and federal spheres, to resolve preemption issues. *Hildebrand v. City of New Orleans,* 549 So.2d 1218 (La.1989), *cert. denied*, 494 U.S. 1028, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990). Inferior legislative power is not supplanted unless it is the clear and manifest purpose of the higher legislative body to do so, or unless the exercise of dual authority is repugnant to an indicated legislative objective. *Id.* Absent explicit preemptive language, the courts will measure legislative intent by examining the pervasiveness of state or federal regulatory schemes, the need for broad-based uniformity, and the danger of conflict between the enforcement of local laws and the administration of state or federal programs. *Palermo Land Co. v. Planning Comm'n of Calcasieu Parish,* 561 So.2d 482 (La.1990); *Hildebrand, supra;* cf. *Wis. Pub. Intervenor v. Mortier,* 501 U.S. 597, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991). In the present matter, unable to point to any statutes explicitly preempting zoning authority over the siting of airports, defendants argue that there exists an implied legislative intent to supersede local control.

> Federal law gives the Federal Aviation Administration broad authority to regulate and control use of the navigable airspace. See 49 U.S.C. §§ 40101, 40103; *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973); *Garden State*

---

(1) consider—

    (A) the duty of an air carrier to provide service with the highest possible degree of safety in the public interest; and

    (B) differences between air transportation and other air commerce; and

(2) classify a regulation or standard appropriate to the differences between air transportation and other air commerce.

(f) Exemptions**.**--The Administrator may grant an exemption from a requirement of a regulation prescribed under subsection (a) or (b) of this section or any of sections 44702-44716 of this title if the Administrator finds the exemption is in the public interest.

15

*Farms, Inc. v. Bay,* 77 N.J. 439, 390 A.2d 1177 (1978).  But despite state and local control being supplanted in connection with the operation and navigation of aircraft, significant local power remains viable, especially concerning land use planning and the zoning of airport facilities. *Garden State Farms, supra,* and authorities therein. See also *City of Burbank, supra* (Rehnquist, J., dissenting); *Faux–Burhans v. County Comm'rs of Frederick County,* 674 F.Supp. 1172 (D.Md.1987), aff'd. 859 F.2d 149 (4th Cir.1988), cert. denied, 488 U.S. 1042, 109 S.Ct. 869, 102 L.Ed.2d 992 (1989). Furthermore, as shown by introduced copies of the Federal Air Regulations, 14 C.F.R. §§ 103.1–103.23, the FAA has limited its control of ultralight vehicles to airspace management. Consequently, we find no federal preemption of Bossier Parish's zoning authority to locate airports within its jurisdiction. Cf. *Faux–Burhans, supra; Garden State Farms, supra.*

　　　We arrive at a similar conclusion in reference to state preemption. Louisiana's aeronautics statutes (LSA–R.S. 2:1, *et seq.*) and promulgated regulations governing ultralight vehicles (9 La.Reg. 417 (1983)) reveal no intent to supersede the zoning authority granted to the Bossier Parish Police jury under Act 189 of 1954, Art. 5 § 1. Our state enactments primarily focus on aircraft and pilot licensing, navigational aids maintenance, and airport funding and safety, rather than upon land use or zoning. See LSA–R.S. 2:1, *et seq.* Indeed, *local authorities unmistakably retain broad control of areas immediately surrounding airports*. See LSA–R.S. 2:381, *et seq.* Consequently, recognizing the special authority of local governments to exercise zoning controls, we find no conflict between Louisiana's aeronautics policy and the parish's power to regulate land use. Cf. generally *St. Charles Gaming Co., Inc. v. The Riverboat Gaming Comm'n,* 94–2697 (La. 01/17/95), 648 So.2d 1310; *Palermo Land Co., supra; Hildebrand, supra.* See also Murchison, *Recent Developments in Local Government Law, 1990–1991,* 52 La.Law Rev. 541 (1991).

*Guillot v. Brooks*, 26,544 pp. 4-5, (La.App. 2 Cir. 3/1/95), 651 So.2d 345, 348–49

(emphasis added), *writ denied*, 95-0776 (La. 4/6/95), 652 So.2d 1338.

We find neither federal nor Louisiana state law pre-empt Jefferson Davis Parish's authority to require TANA marker balls on tower guy wires for the enhanced safety of pilots, tower owners, and property owners.  GTP was required to comply with this local safety requirement.  We note that even its own expert, Benjamin Doyle, said he believed GTP was required to follow the requirement of the local ordinance.

We also reject GTP's argument that there was insufficient evidence in the record for the jury to reasonably conclude that GTP knew or should have known about the ordinance they were required to implement when they became the owner of the tower. GTP claims ignorance of the local ordinance, but ignorance of the law is no excuse. Moreover, the record belies its representation. The FAA notified GTP in writing on March 10, 2011, in its "Marking and Lighting Recommendation" that the tower must comply with any local ordinances in addition to the federal requirements. Paul Bergendahl (Bergendahl), an employee of American Tower Corporation, a real estate investment company and affiliate of GTP, testified as a representative of GTP. Bergendahl testified that this letter is a common form-letter from the FAA to tower owners such as GTP which he has seen many times. The letter in pertinent part states: "This evaluation concerns the effect of the marking and/or lighting changes on the safe and efficient use of navigable airspace by aircraft and *does not relieve the sponsor [GTP] of compliance responsibilities relating to any law, ordinance,* or regulation of any Federal, *State, or local government body*" (Emphasis added).

Curt Bowers (Bowers), retired director of and pilot for Jefferson Davis Parish Mosquito Abatement (aerial application to eradicate mosquitos), who acted as volunteer tower coordinator for the parish, testified at trial. Bowers is also a commercial aerial applicator, i.e. crop duster pilot, of long experience. He explained that TANA marker balls are required on guy wires to protect pilots, tower owners, and the property owners who lease property for placement of towers. Bowers explained that the placement of TANA markers was made a safety requirement because: "It's almost virtually impossible to see the guy wires on these towers without these TANA wire markers…" He further explained: "[TANA markers] establish within an instance (sic) a three-point system at a glance that gives you a

17

reference of where the guy wire—the outer guy wire of the tower of the direction it is going to the anchor." Bowers also explained the effect of having TANA markers on towers: "Instead of having to focus solely on trying to determine where that guy wire is, you're able to focus on all of the other requirements of—of being a pilot and maneuvering the aircraft in a safe manner if you're able to at a glance have a reference as to where obstructions may be in regards to a tower." He notified GTP twice by telephone in 2010, after it became the new owner of the tower, that its tower was not in compliance with the parish's TANA marker requirement. It was the province of the jury to assess his credibility as a witness, and there is no basis in the record by which we could conclude the jury erred in accepting his testimony as true.

After our thorough review of the record we further find there is sufficient evidence therein from which the jury could reasonably conclude that the absence of the TANA marker balls presented an unreasonable risk of harm to pilots such as Precht.

> The underlying claim at issue in this matter arises from La.Civ.Code art. 2317, as modified by La.Civ.Code art. 2317.1. Louisiana Civil Code Article 2317 provides responsibility "for the damage occasioned by our own act," as well as the damage "caused by the act of persons for whom we are answerable, or of the things which we have in our custody." This responsibility is modified by the articles that follow, including particularly La.Civ.Code art. 2317.1, which provides:
>
> > The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.
>
> Thus, in order to prevail in a cause of action based on La.Civ.Code art. 2317.1, a plaintiff must prove: (1) that the defendant had custody of the thing; (2) that it had a vice or defect that presented an unreasonable risk of harm; (3) that the defendant knew or should have known of the vice

or defect; (4) that the damage could have been prevented by the exercise of reasonable care; and (5) that the defendant failed to exercise this reasonable care. *Riggs v. Opelousas Gen. Hosp. Trust Auth.*, 08-591 (La.App. 3 Cir. 11/5/08), 997 So.2d 814.

*McCoy v. Town of Rosepine*, 15-898, p. 4 (La.App. 3 Cir. 3/9/16), 187 So.3d 562, 565, *writ denied*, 16-664, 860 (La. 6/17/16), 192 So. 3d 765, 768.

We have already referenced Bowers' testimony in this regard. He is an experienced crop duster pilot and worked with the police jury to determine the need for and placement of TANA markers on tower guy wires. As an experienced pilot Bowers explained that the "number one" harm presented by towers without TANA marker balls on the guy wires is "death to the [pilot] applicator." Dwayne Bebee (Bebee), owner of Riceland Aviation and a general aviation pilot testified. When asked if he, as an experienced pilot, found TANA marker balls on guy wires helpful, he said: "Yes. Visibility is everything when you're flying." Dr. Robert Post, Phd. (Dr. Post), testified as an expert witness qualified in "vision visibility, attention, and visual sciences." Dr. Post testified that he has been qualified as an expert witness in over 1,500 cases and estimated he was an expert for the defense in about 60% of the cases and for plaintiffs in about 40% of those cases. He testified that the half-inch guy wires used to secure this tower are hard to see because of their size and because they are often in a pilot's peripheral vision. Dr. Post explained that *unmarked* guy wires require a more time-consuming sequential search to see them and realize where they are located proximate to the plane, whereas, those *marked with TANA markers* "pop out" in one's vision quicker (Emphasis added).

> They're visible immediately, and they –they don't immediately affect the wires' visibility, but you know darn well that the wire runs from the center of one ball to the center of the other so you know where the wire is and more or less on the basis of pop out or parallel search information. The gist of the story is the balls help the visual search by changing the nature of the visual search. It's—it's now, oh, pop out, there's the wire as compared to is the wire here, is the wire here, is the wire here, it is the wire—oh it is, you know takes more time.

19

Dr. Post also explained that TANA marker balls allow the viewer to "connect the dots" and quickly infer the location and existence of the wire. Humans, he says, are very good at "connecting the dots," and "so we connect the dots in order to see the wire." When asked if a "pilot would (be) able to interpret a line down to the ground in a reasonable degree of certainty to determine the end of the guy wires" when they are marked with TANA markers Dr. Post responded: "That's exactly the relevance of this to this case." According to his expertise, seeing the marked wires is "a snap. You—you look. You see the marker balls, and you say, oh, there's the wire." He also explained that when:

> you're flying at high velocity towards an object, time is your enemy. The—the more time it takes to figure out where a hazard is the more likely it is that you're going to encounter the hazard. So, *effortful* visual searches increase the likelihood of accidents in this context, which is why—why the marker balls are sold. (Emphasis added).

Lemuel C. Shattuck (Shattuck), testified as an expert in "aviation, aviation regulatory compliance and aviation safety." He has logged over 11,000 total flight hours, 9,500 of which are in agricultural aviation. He retired as an aerial applicator after twenty nine years of flying. He noted in his testimony that his flight record is not as impressive as Precht's who logged some "19,000 hours" of flight time. Shattuck opined that *the absence of TANA marker balls on the tower guy wires "were a substantial factor"*(our emphasis) *in causing the wire strike.* When asked if he thought that the accident would "more likely than not" have been prevented by the presence of TANA marker balls he responded: "That's my opinion." GTP's expert, Colonel Jameel Joseph (Colonel Joseph), testified he did not have the expertise to give an opinion regarding "marking" and thus was unable to say whether the absence of TANA markers on the guy wires presented an unreasonable risk of harm.

Further, Shattuck explained what Precht was likely going through when he made his final pass and clipped the tower wire causing him to crash (emphasis added):

Now, on the second pass, when he comes in, he's got a lot of stuff going on. At one point, I think he saw the wires, okay. The thing is that you have things competing with his attention. I wouldn't call it a lack of situational awareness. When you're coming down, you're getting lower to the ground. The ground is coming up. You're watching that wire 'cause it's like a snake over there. So you've got to check other stuff. You can't just watch it. You just can't stare at that wire. The ground's coming. You have to round out the airplane so you don't hit the ground. Plus, a quarter mile out, you've got this thing coming up, so you kind of have to take a look at that. You have a lot of things competing for your attention. I think its probable that he got down into the pass, glanced away from the wire to watch the ground coming up or whatever—and I'm talking about less than a—much less than a second. Just glance away from the wire and looked back to find the wire and was unable to reacquire the wire. He got in, as Dr. Post said, a where is Waldo moment, but he had only that last half a second. So I think it's highly probable he came down, glanced away—which he had to. He had to glance away. You can't just stare at the wire and, you know, fly the airplane. I think he glanced away and went back to find it and boom it was gone. Plus, when he rounded up—when he rounded out at the bottom, the nose of that airplane is coming up probably within a second-and-a-half or two seconds before the wire. He couldn't even see the anchor or the wire at that point. It'd be covered—covered up by the body of the airplane.

Plus, he had a seven-knot north wind. He actually had a three degree wind correction which would have exacerbated the problem, but—so I think that's—I think that's highly probable if he—in the absence of the TANA markers—I don't—I don't know if he was—it was more likely in the absence of the TANA markers. *The TANA markers I think would have made it—enabled him to reacquire that wire right away, and if he—I think that lag in being able to reacquire the wire was probably the problem.* Now, you know, he didn't fly that airplane into the wire. He just took—he barely hit the wire. He took two or three feet of wing off that wing, so he didn't hit the wire dead on. He glanced away. You know, it was a miscalculation, and, you know, there was a miscalculation involved on his part. There's no denying that, you know. The thing is it's my opinion if the wires had been marked with those TANA markers in accordance with the Jefferson Davis ordinance as they're required to be I think it would have foreclosed the possibility of that accident happened(sic)—or let me say that better, it would have reduced the likelihood of that accident happening.

Thus, the record shows the jury could reasonably conclude that the absence of the TANA marker balls presented an unreasonable risk of harm to pilots such as Precht and was a "substantial" cause of the crash. Contrary to GTP's assertion, its tower was not free of defects and it knew of the existence of the defect which caused damage that it could have prevented in the "exercise of reasonable care". *See* La.Civ.Code art. 2317.1 and 2322. In short, GTP breached the duty it owed Precht and that failure substantially contributed to the plane crash. Thus, we find no merit to GTP's first and second assignments of error.

GTP asserts the jury erred in assessing 21% fault to Precht for striking the guy wire and thereby damaging the tower and crashing to his death. We disagree.

> Indisputably, more than one party may be at fault for the damages sustained in the vehicular accident giving rise to these proceedings. This is premised in Louisiana's comparative negligence scheme articulated in La. C.C. art. 2323. In deciding which parties are responsible, this Court has adopted a duty-risk analysis to establish the existence of delictual liability under La. C.C. art. 2315. *Lazard v. Foti,* 02–2888, p. 3 (La.10/21/03), 859 So.2d 656, 659. "In determining whether liability exists under a duty-risk analysis, a plaintiff must prove that the conduct in question was the cause-in-fact of the resulting harm, that [the] defendant owed a duty to [the] plaintiff which [the] defendant breached and that the risk of harm was within the scope of protection afforded by the duty breached." *Campbell v. La. Dept. of Transp. & Dev.,* 94–1052, p. 5 (La.1/17/95), 648 So.2d 898, 901, citing *Mundy v. Dept. of Health and Human Resources,* 620 So.2d 811 (La.1993). The duty-risk analysis is applicable for our consideration of whether Mr. Brooks and Mr. Fontenot should be apportioned fault for the accident.

*Fontenot*, 23 So.3d at 267.

In *Darbonne v. Bertrand Investments, Inc.*, 11-1224, pp.4-5 (La.App. 3 Cir. 3/7/12) (unpublished opinion), we explained the further holding in *Fontenot* regarding the deference owed the fact finder in allocating fault:

> Regarding the allocation of fault, the court in *Fontenot,* 23 So.3d at 274 stated:

>> The law provides we must give great deference to the allocation of fault as determined by the trier of fact. *Clement v. Frey,* 95–1119, 95–1163, p. 7

22

(La.1/16/96), 666 So.2d 607, 610. We are also aware that the allocation of fault is not an exact science, or the search for one precise ratio, but rather an acceptable range, and that any allocation by the factfinder within that range cannot be clearly wrong. *Foley v. Entergy La., Inc.,* 06–0983, p. 32 (La.11/29/06), 946 So.2d 144, 166. Only after making a determination that the trier of fact's apportionment of fault is clearly wrong can an appellate court disturb the award. *Clement,* 95–1119 at 7, 666 So.2d at 611.

As to the allocation of fault, the trier of fact is bound to consider the nature of each party's wrongful conduct and the extent of the causal relationship between that conduct and the damages claimed. *Watson* [*v. State Farm Fire and Cas. Ins. Co.*], 469 So.2d [967,] 971. We are guided by the factors articulated in *Watson:* (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. *Id.,* 469 So.2d at 974.

As the testimony of Shattuck, and other witnesses referenced above shows, the jury had a more than reasonable basis to asses less fault to Precht for a momentary miscalculation than to GTP for failing to place TANA markers on its tower. Additionally, Shattuck described Precht as:

an outstanding pilot [who] ha[d] an unbelievable amount of experience, 19,000 hours. He was active in the NAAA. He was the president at one point of the Louisiana Agricultural aviation Association which runs—they run sponsor programs called PAASS, which are professional aerial applicator safety programs. So he was active in the—in the organizations. He—one thing I noticed that was interesting when—when they decided to quit—we used to—and you've probably seen them around, but we used to have piston air engines on these airplanes that we were around, and we called them radial engines, and we went to turbines, which are essentially jets that turn a propeller, fifteen years ago we started going to them. And when Mr. Precht transitioned from pistons to turbines, he went to SIMCON in Florida and SIMCON is a big simulator and safety company. So that is evidence that he did it right, and I was impressed with that because my turbine transition consisted of just move this lever here and press this button, and if this needle goes into the red, you're fired. So I thought that was very impressive that he had taken the time to go down and learn to do it correctly.

23

Shattuck also testified he did not see any evidence to indicate Precht was fatigued as suggested by GTP, explaining:

> He flew—the Satloc records the time, and the—and the—and the flight in the evening lasted two hours and five minutes, and they logged one hour and 45 minutes that morning, so that –he flew three hours and fifty minutes that day, which is not very much at all. It's not atypical to fly ten or even 12 hours during a—the busy time of the season.

Shattuck also testified he saw no evidence that Precht had become complacent about flying repetitively that day as suggested by GTP's expert as a possible explanation for the crash:

> These big towers with the guys [wires] are scarry (sic). I flew for 30 years,, and they were scarry(sic). I think they're scarry(sic) to every ag pilot in—well, "scarry,"(sic). That's the wrong word. You're not afraid of them, but you approach them with respect. Anytime you're working in the vicinity of one of those towers as I think –as Joseph—Colonel Joseph said—how did he say it? You have to keep your head in the game and I think is the way he put it. That's absolutely true. You don't get complacent around an obstacle like that. It—it's—it's—as Colonel Joseph said it's a dynamic environment. You don't get complacent any time.

In response to GTP's expert, Colonel Joseph's, testimony that Precht was just flying in repetitive circles all day long and thus *might have* become complacent from the monotony, Shattuck further explained why he opined that was not correct.

> No two passes are the same in that—in that business. You—you always have to be aware of what's coming up, and you have to be thinking—we call it staying in front of the airplane. If –when a—and new students are always behind the airplane. The airplane's out there and they're back here doing something. You have to stay in front of the airplane which is just basically plan ahead.
>
> . . . .
>
> The fact that he was engaged after 19,000 hours of aerial application bespeaks that he was doing something correctly as—as far as—as safety—as safety goes. He had—to my knowledge--, he had no accidents or incidents prior to that day. He had a clean record.

Shattuck also testified that "we will never know exactly what happened…what he was doing at that point."

Bowers testified that he believed Precht clipped the guy wire because it was not visible to him:

> I would say that the guy wire was not visible. I don't think that he intentionally was trying to fly through the guy wires of—of the tower. What I'm stating is that his distance from the guy wire was within that—that distance because the guy wire was not visible. I would state that he was not trying to see how close to the guy wire he could get on that pass.

Bowers also testified that he "observed [Precht's] operations, and [he] never saw any fault of Mr. Precht as an—as an operator, an aerial operator. I would emphatically say that I—on all of the instances that I was aware of Mr. Precht's operation—aerial operations, I never saw any fault in his operation."

After a thorough review of the record, we cannot say the jury's allocation of fault to Precht was outside an acceptable range given the testimony we have recounted above. We find the jury's allocation of fault was reasonably based on the evidence before it and there is no basis for this court to disturb the jury's finding.

Finally, GTP asserts "[t]he jury awarded damages not allowed by law." GTP asserts the monetary amount of the damage award for the total loss of the plane is not consistent with the supreme court's directive in *State Farm Mutual Automobile Insurance Co. v. Berthelot*, 98-1011 (La. 4/13/99), 732 So.2d 1230. We agree that *Berthelot* sets forth the measure of damages for the total loss of a vehicle, or in this case an airplane, as the "value[] just before the accident, less its salvage value, if any." *Id.* at 1234. But we do not agree with GTP's assertion that the jury's award runs afoul of this standard. GTP's argument relies on its calculation of the amount of the loss based on *its* valuation, but the record contains testimony by experts and lay witnesses from which the jury could reasonably arrive at *its* figure properly applying *Berthelot*.

> Every act of man that causes damage to another obliges him by whose fault it happened to repair it. La.Civ.Code art. 2315. One injured

25

through the fault of another *is entitled to full indemnification for damages caused thereby. Coleman v. Victor,* 326 So.2d 344 (La.1976); *Jordan v. Travelers Ins. Co.,* 257 La. 995, 245 So.2d 151 (1971). In such a case, "[t]he obligation of defendant ... is to indemnify plaintiff—*to put him in the position that he would have occupied if the injury complained of had not been inflicted on him." Coleman,* 326 So.2d at 346, *quoting Lambert v. American Box Co.,* 144 La. 604, 613, 81 So. 95, 98 (1919).

As a general rule, the recovery of damages to a vehicle is limited to the cost of repair. *Giles Lafayette v. State Farm Mut. Auto. Ins. Co.,* 467 So.2d 1309 (La.App. 3 Cir.), *writ not considered,* 472 So.2d 911 (La.1985). However, where a vehicle has been totally destroyed or so badly damaged that the cost of repair exceeds its value, the measure of damages is the value of the vehicle just before the accident, less its salvage value, if any. *Holt v. Rapides Parish Police Jury,* 574 So.2d 525 (La.App. 3 Cir.1991); *Calk v. Grain Dealers Mut. Ins. Co.,* 508 So.2d 624 (La.App. 2 Cir.1987); *Brown v. Morgan,* 449 So.2d 606 (La.App. 1 Cir.1984); *Sibley v. Insured Lloyds,* 442 So.2d 627 (La.App. 1 Cir.1983); *Bernard v. Fidelity & Cas. Co. of N.Y.,* 186 So.2d 904 (La.App. 1 Cir.1966).

*Berthelot,* 732 So.2d at 1234 (emphasis added).

Bebee testified that Riceland did a lot of expensive improvements on the airplane after buying it. Shattuck testified that just the overhaul of this particular type of turbine engine on this airplane, as was done by Riceland before the crash, is between $350,000 and $450,000. Considering all improvements to the plane, Bebee gave it a "fair market value" of between $700,000 to $750,000. No evidence was introduced contradicting the reasonableness of his figures. Shaen Phillips (Phillips), an adjuster for USAIG, testified as an expert witness in the field of insurance adjustment for aircraft. He testified USAIG paid $7,376.80 to have the airplane removed after the crash and paid a total of $1,766.25 for storage of the crashed airplane. He determined the plane was a total loss. GTP does not dispute this conclusion. Phillips placed a fair market value of $680,000 on the airplane at the time of the crash. In explaining his methodology for arriving at his valuation he testified he looked at recent sales of similar aircraft and advertisements of similar aircrafts for sale. He testified he had "some difficulty" finding comparable sales

because this airplane is unique. He, too, noted Riceland equipped Precht's plane with an expensive turbine engine after acquiring the aircraft and added expensive avionics. According to Phillips, there are "just under 200 of th[e]se aircraft flying in the U.S. today, and of those, approximately 200 there's only a handful that are turbine equipped" like this airplane. He explained that just the cost to make the conversion to turbine averages $200,000, which does not include the cost of the engine or fuselage. After considering all of these costs and factors Phillips arrived at his valuation. Importantly, when asked his opinion of Bebee's fair market valuation of between $700,000 and $750,000, he said "*I could not take exception to that whatsoever… I absolutely couldn't argue with that*."(emphasis added) Phillips also stated that when he was able to find an available engine similar to the one in Precht's plane it now costs $800,000 with 5,600 hours on it since its last overhaul. Another such engine priced within sixty days of trial "was just under a million dollars for the engine, just for the engine." At the time of the crash Precht's plane had only 4,500 hours logged and was largely overhauled just 1,000 hours prior to the crash. He also stated that the propeller alone costs $40,000 and the one on Precht's plane had only eighty-one hours logged since it was overhauled. Evidence shows USAIG received a total of $62,718 for salvage value including electronics.

The jury awarded $645,139.58 in damages for the plane. The testimony of Bebee and Phillips is uncontradicted and each is corroborated by the other. It was for the jury to reasonably determine the fair market value based on the testimony presented establishing fair market value and the amount of salvage value as reflected by the bill of sale introduced as evidence. Simple mathematics demonstrates that the figure awarded by the jury is not in derogation of the directive in *Berthelot*. Based on the figures presented to the jury the award could reasonably have ranged from a high of at least $687,282 to a low of $617,282. Thus, while the award might

be lower than the evidence suggests, we cannot say the jury manifestly erred in arriving at its figure. USAIG has not appealed the award as being too low. We therefore find no merit in GTP's contention that the jury's damage award runs afoul of *Bertholet* simply because GTP insists the jury had to use $680,000 as its highest value.

For the reasons stated, we affirm the trial court judgment in all respects. All costs of this appeal are assessed against Appellants GTP Infrastructure I, LLC and CNA Insurance Company.

**AFFIRMED**.